IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURA ANDERSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| OTG MANAGEMENT | : | NO. 25-3356 |

MEMORANDUM

Bartle, J. September 8, 2026

Plaintiff Laura Anderson has sued her former employer, OTG Management, for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.), the Pennsylvania Human Relations Act ("PHRC") (43 P.S. §§ 951, et. seq.), and the Philadelphia Fair Practices Ordinance ("PFPO") (Phila. Code §§ 9-1101, et seq.), for associational disability discrimination and retaliation under the Americans with Disabilities Act ("ADA") (42 U.S.C. § 12102, et. seq.), the PHRC, and PFBO, and for retaliation under the Family Medical Leave Act of 1993 ("FMLA") (29 U.S.C. §§ 2601-2664).

Before the court is the motion of the defendant for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). The court views the facts and draws all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id. In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

In employment discrimination cases, the summary judgment standard "is applied with added rigor . . . [because] intent and credibility are crucial issues." White v. Presbyterian Med. Ctr. of Univ. of Pennsylvania Health Sys., No. 20-6362, 2022 WL 3213534, at *2 (E.D. Pa. Aug. 8, 2022) (quoting Stewart v. Rutgers, The

State Univ., 120 F.3d 426, 431 (3d Cir. 1997)) (internal quotation marks omitted).

The court, in reviewing a motion for summary judgment, must only consider the factual citations of the parties to the record. The court has no obligation to scour the record otherwise to find a genuine dispute of material fact. See Langman v. Keystone Nat'l Bank & Tr. Co., 672 F. Supp. 2d 691, 694 (E.D. Pa. 2009). As our Court of Appeals has noted, "[j]udges are not like pigs, hunting for truffles buried in briefs." United States v. Starnes, 583 F.3d 196, 216 (3d Cir. 2009) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

II

The following facts, as cited by the parties, are undisputed or taken in the light most favorable to the plaintiff, the non-moving party.

OTG Management is a company that operates bars and restaurants at various airports. It has an "Unacceptable Conduct and Unprofessional Behavior" policy that states:

> Crewmembers are expected to behav[e] appropriately and professionally at all time. Insubordination or failure to follow instructions, use of obscene or suggestive language, rudeness or any verbal attack on any crewmembers or managers is unacceptable behavior and violation of company policy.

Plaintiff is an Asian woman who was hired by OTG Management to work as a server at a bar and restaurant at the Philadelphia International Airport on January 18, 2022. LaQuana Stokes, defendant's Senior Human Resource Business Partner, was the person who hired plaintiff. For the majority of her employment, plaintiff was the only Asian server. She reported to various managers in the airport during her employment, including Daniel Watson. It appears that Watson is in a subordinate position to Stokes at OTG Management.

According to plaintiff, her daughter, A.A, has a severe mood disorder and ADHD. On her hiring date, plaintiff emailed defendant's Human Resources a copy of a letter from A.A.'s Intensive Family Case Manager explaining A.A.'s conditions and "the requirements in connection therewith." Plaintiff also discussed this letter with Stokes around the time she started employment. She had numerous discussions throughout the next year with Stokes about her daughter being in and out of facilities and about other programming related to her conditions. On June 19, 2023, Stokes suggested over email that plaintiff apply for intermittent leave under the federal Family and Medical Leave Act ("FMLA"). The email stated:

> I believe this is the best option for your situation, and will protect you for [sic] any issues related to your trying to find coverage or calling out. If this is an

> options [sic], please let me know I will
> send you the contact information
> to get the paperwork started immediately.

In connection with her request for FMLA leave, plaintiff and A.A.'s psychiatrist completed a Certification of Health Care Provider for Family Member's Serious Health Condition on October 23, 2023 and October 26, 2023. A.A.'s psychiatrist detailed A.A.'s mood disorders in the Certification and noted that she requires 24/7 supervision due to erratic sleep behavior. The form was submitted to MetLife, which acted as a third-party administrator for defendant to manage and process FMLA employee claims. On November 6, 2023, MetLife informed plaintiff that she had been approved for FMLA leave beginning on October 25, 2023 and that leaves taken between October 25, 2023 and October 24, 2024 would be considered approved leave under the FMLA.

During her employment, plaintiff experienced a discrepancy in her tip distribution that management left unresolved for a long period of time. Meanwhile, a tip complaint raised by Lauren Millay, a non-Asian server in the same position as plaintiff, was promptly resolved. Additionally, plaintiff was not getting along with manager Watson during her employment. Plaintiff testified that Watson would "catch an attitude" with her and that Stokes was

"dismissive" of her concerns. Watson also admonished plaintiff for being on her phone, including on one occasion when she was taking a call regarding her daughter, while he ignored similar conduct by other employees who simply sat at the bar on their phones.

Plaintiff began exercising her right to FMLA leave after October 25, 2023. As A.A.'s condition escalated to the point that A.A. began residing at a residential treatment facility, Watson responded to plaintiff "not with support but with hostility." Each time plaintiff called out to take her intermittent leave, Watson would say, in substance, "oh, it's my daughter, it's my daughter, I'm leaving," or phrases suggesting plaintiff was using her daughter's condition as "[a]nything to get out of work."

Plaintiff complained to Stokes in Stokes' office about Watson's "discriminatory comments" regarding A.A. on multiple occasions, including on February 13, 2024. She first started complaining about Watson's comments several months prior to February 2024. She could not recall what she said in those conversations. She also submitted a written complaint on February 28, 2024 raising concerns about an unidentified "unprofessional" "manager/director." The complaint said that she was "worried [her] rights can b [sic] violated speaking w [sic] them or anyone in hr [sic] here" and asked to have someone

call her because she does not "feel comfortable dealing with our hr [sic] at [her] location."

Stokes also inquired of defendant's senior benefits manager, Ivette Fuentes, about plaintiff's FMLA leave. On March 7, 2024, Stokes emailed Fuentes that plaintiff had taken intermittent FMLA leave and "frequently" called out invoking it. Stokes asked how to obtain a report from MetLife to verify that plaintiff was properly reporting her absences. She also asked when plaintiff's leave would exhaust. On March 8, 2024, Fuentes responded that plaintiff's leave did not expire until October 2024 and that plaintiff was properly reporting her absences. The next day, March 9, 2024, on a day that plaintiff used her FMLA leave, Stokes emailed the management "team" the following:

> Good Afternoon Team,
>
> I wanted to follow up with the team in regard to Laura Anderson [sic] current FMLA status. I received notification that she is currently reporting all call outs as required to MetLife. Her Intermitting FMLA exhaust [sic] on October 24 2024, in which if she still needs recertify [sic]. As mentioned before, if Laura is not properly performing her job as a server, and exhibiting major issues related to performance, management needs to proactively as a team document those issues and behavior. If you have any other questions, please let me know.
>
> LaQuana Stokes / Sr. Human Resources Business Partner

When plaintiff contemporaneously discussed her daughter's condition and her FMLA leave with Stokes, Stokes suggested that plaintiff take "a break off of work and get [her] family together" or otherwise conveyed that plaintiff should simply quit. Plaintiff's FMLA usage report confirms that she invoked her intermittent leave with a callout on March 1, 2024, with notice sent to defendant on March 2, 2024, and again with a call-out on March 8, 2024, notice sent March 9, 2024, the same date Stokes emailed management to begin documenting performance issues.

On March 20, 2024, plaintiff was involved in a confrontation with Watson. According to plaintiff, she and Watson had not been "getting along," that he was "[m]ost likely, micromanaging and just nitpicking at everything." Watson instructed plaintiff on her use of a serving tray in a "hostile, yelling manner" in front of other employees. Plaintiff called out Watson for these instructions that singled her out and was part of a broader pattern in which she was "always getting coaching" over "the littlest things" that her coworkers were not disciplined for. Other employees were using the serving tray in the same way that plaintiff was. In plaintiff's words, "we're all doing the same thing. We're really busy, and you're not saying the same rules apply to everybody across the board."

Watson then tried to send her home or provide her with "coaching" that day.

Plaintiff then tried to step away and calm down when Stokes and several managers entered the area. She called Stokes "a 'B' word," and left for another store at the airport. One manager, Sam, "cuss[ed] her out." Stokes followed. Stokes then asked plaintiff to surrender her badge. Plaintiff refused because she understood that they were supposed to call her union representative before asking her to surrender her badge. Stokes responded that it was protocol to ask a party in an altercation to surrender her badge after a confrontation. When plaintiff continued to refuse, Stokes and the other managers called the police and physically "yank[ed]" the badge off of her.

That same day, Stokes issued plaintiff a Suspension Notice pending investigation by Stokes. As requested, plaintiff submitted a written statement that explained that Watson had "singled her out over the tray instructions when other servers were doing the same thing," that she and Watson "haven't always been in good terms" but that she felt "we are able to work [without] issue," and that she felt she had "a target on [her] back" because of repeated nitpicking and coaching.

Stokes made the decision to terminate plaintiff's employment, effective March 27, 2024. The Crewmember

Termination Notice, written by Stokes, stated:

> After reviewing all information and statements pertaining to the incident for which you were suspended, our decision is to separate employment effective March 27th 2024. Upon HR investigation of your suspension on March 20th, 2024; it was reported that manager Daniel and Sam was [sic] trying to coach you on the correct steps of services related to the a [sic] "Mise tray" and you became hostile and combative towards management. During this time when HR had a conversation with you regarding the incident, and when your badge was requested, you refused and begin [sic] recording without consent. Airport Police were notified to retrieve your badge; and you became extremely upset and starting [sic] being combative and verbally attacking HR, by referring to me as a "Fucking Bitch". You continued your verbally [sic] attack towards the manager Leslie in front of the officer by accusing her of clearing out your phone. Laura your actions is a violation of the company policy in regards to "Unacceptable Conduct and Unprofessional Behavior".

III

Defendant first argues that there is no evidence that defendant was discriminated against based on her race.

Claims of race discrimination under Title VII, the PHRA, and the PFPO are analyzed under the same burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See McLintock v. City of Philadelphia, 504 F. Supp. 3d 411, 422 (E.D. Pa. 2020), aff'd, No. 20-3453, 2022 WL 395995 (3d Cir. Feb. 9, 2022); Fleet v. CSX Intermodal, Inc.,

Civ. A. No. 17-3562, 2018 WL 3489245, at *9 (E.D. Pa. July 18, 2018). Under this framework, the plaintiff must produce sufficient evidence of her prima facie case of discrimination or retaliation. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999). A plaintiff establishes a prima facie case by showing: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. Id. The burden then shifts to the defendant to come forward with a legitimate, non-discriminatory or non-retaliatory justification for its action. Id. at 412. If defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered explanation is pretextual. Id.

Defendant does not dispute that plaintiff is a member of a protected class, that she was qualified for her position, or that her termination was an adverse employment action.[1] To establish the fourth element, a plaintiff may either: '(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class

[1] Plaintiff and defendant both agree that any discrimination claim resting on the tip discrepancy she experienced in or before August 2023 is untimely. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between h[er] membership in a protected class and the adverse employment action.'" Drummer v. Hosp. of the Univ. of Pa., 455 F. Supp. 3d 160, 168 (E.D. Pa. Apr. 21, 2020).

Plaintiff has not made out a prima facie case of race discrimination. There is no evidence that Stokes, who terminated her, ever mentioned her race, took any action implicating her race, or had any information that anyone employed by defendant ever said anything about or took any action against her based on her race.

Even if plaintiff could make out a prima facie case of discrimination, defendant articulated a legitimate, non-discriminatory reason for its decision to terminate plaintiff's employment. The burden of production is "relatively light," since all the employer must do at this stage is to "introduc[e] evidence, which taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Defendant's proffered reason for plaintiff's termination is the March 20, 2024 altercation, her cursing at Stokes, her refusal to hand in her badge after the altercation, and her violating defendant's Unacceptable Conduct and

Unprofessional Behavior policy. That policy states that any "[i]nsubordination or failure to follow instructions, use of obscene or suggestive language, rudeness or any verbal attack on any crewmembers or managers is unacceptable behavior and violation of company policy." Plaintiff admitted she cursed at Stokes, one of her supervisors.

Plaintiff has not come forward with evidence on her race discrimination claims that defendant's stated reason for termination was pretextual. To defeat summary judgment on pretext, a plaintiff need only point to evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated reasons; or (2) believe that discrimination was more likely than not a motivating or determinative cause of the adverse action. Fuentes v Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Plaintiff does not set forth any issue of material fact as to pre-text.

Accordingly, summary judgment will be entered in OTG Management's favor on plaintiff's claims of race discrimination under Title VII, the PHRA, and the PFPO.

IV

Defendant next argues that plaintiff has not come forward with evidence that it violated the ADA, PHRA, and PFBO by discriminating against her as a result of her daughter's disability.

Under the ADA, employers are prohibited from discriminating against a qualified individual on the basis of their disability, or a relative or associate's disability, in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." See 42 U.S.C. § 12112(a); Dodson v. Coatesville, Hosp. Corp., 773 F. App'x 78, 83 n.8 (3d Cir. 2019); Butler v. Fedex Supply Chain, Inc., No. 23-01295, 2026 WL 801426, at *15 (M.D. Pa. Mar. 23, 2026). The same legal standard that applies to ADA applies equally to disability discrimination claims under the PHRA and PFBO. See Colwell v. Rite Aid Corp., 602 F.3d 495, 499 n.3 (3d Cir. 2010); Ditko v. Project Home, No. 21-5095, 2022 WL 23024315, at *1 n.1 (E.D. Pa. June 16, 2022).

Disability discrimination cases are subject to the same McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework as those involving race discrimination. See Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667-68 (3d Cir. 1999); Ransom-Ellison v. Childrens Hosp. of Philadelphia, 826 F. Supp. 3d 616, 624 (E.D. Pa. 2026).

To establish a prima facie case of associational disability discrimination under the ADA, PHRA, and PFPO, a plaintiff must show: (1) she was qualified for her job; (2) she suffered an adverse employment action; (3) her employer knew she

had a relative or associate with a disability; and (4) the adverse action occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the employer's decision. Dodson v. Coatesville, Hosp. Corp., 773 F. App'x 78, 83 n.8 (3d Cir. 2019). The fourth element, that is the causation element, may be satisfied by evidence that the employer was "motivated by unfounded stereotypes or assumptions about the need to care for a disabled person." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 511 (3d Cir. 2009). Defendant does not dispute the first three elements and argues solely that plaintiff fails create a dispute of fact as to the causation element.

Defendant asserts that Stokes, the decisionmaker with respect to plaintiff's termination, never made any adverse comments to plaintiff about her daughter's disability despite knowing about A.A.'s disability since 2022, years before plaintiff's termination.

It is true that Stokes offered help to plaintiff and advised her on obtaining FMLA after plaintiff was hired. Thereafter, in early 2024, Stokes tracked how frequently plaintiff invoked her FMLA leave and sought assurances that she was following the rules. It is certainly the proper role of a superior such as Stokes to do so. However, there is evidence that Stokes, several weeks before plaintiff's termination,

attempted to get plaintiff to quit her job instead of using her intermittent leave.

In addition, Watson, plaintiff's supervisor, showed dismissive and uncaring behavior whenever she called out for her daughter's condition. He presumed, even before her FMLA leave was approved, that she simply wanted time off, and later that she was using her daughter's condition as a pretext to avoid work. He also made jokes about A.A.'s mental health condition that made plaintiff feel uncomfortable. Stokes knew about this behavior. While Watson was not a decisionmaker as to plaintiff's termination and his comments may be insufficient on their own to support an inference of discrimination, it is still relevant to demonstrating a general animus towards plaintiff, particularly if it accrued close in time to the termination decision. See Swiatek v. Bemis Co., 542 F. App'x 183, 187 (3d Cir. 2013). Altogether, a jury could find that circumstances raise a reasonable inference that that the disability of plaintiff's daughter was a determining factor in the Stokes' choice to terminate plaintiff.

Defendant has met its burden of production that plaintiff's termination was for a non-discriminatory reason. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). As stated above, the proffered reason for plaintiff's termination is the March 20, 2024 altercation, her cursing at

Stokes, her refusal to hand in her badge after the altercation, and violating defendant's Unacceptable Conduct and Unprofessional Behavior policy.

A jury could reasonably find that the defendant's reasoning was pretextual with respect to her disability discrimination claims under the ADA, PHRA and PFBO. Plaintiff must prove not that the unlawful reason was the sole reason for the decision but only that the unlawful reason was a determinative factor in the adverse employment decision. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). The record contains sufficient circumstantial evidence from which a jury could conclude that the disability of plaintiff's daughter and the associated taking of FMLA leave was a determinative factor in the employment decision to terminate plaintiff's employment.

Accordingly, the court will not grant summary judgment as to plaintiff's associational disability claims.

V

Defendant further argues that there is no evidence to support plaintiff's retaliation claims under Title VII, the ADA, the PHRA, the PFPO, and the FMLA.

To establish retaliation, a plaintiff must show that: (1) she was engaged in a "protected activity"; (2) subjected to an adverse employment action" such as termination; and (3) a causal connection between the protected activity and the adverse

employment action exists. Ransom-Ellison v. Childrens Hosp. of Philadelphia, 826 F. Supp. 3d 616, 624 (E.D. Pa. 2026) (citing Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 346 (3d Cir. 2022); see also Aguiar v. Morgan Corp., 27 F. App'x 110, 112 (3d Cir. 2002). Retaliation claims are then subject to the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework. See Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 346 (3d Cir. 2022); Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667-68 (3d Cir. 1999); Ransom-Ellison, 826 F.Supp.3d at 624.

Plaintiff's retaliation claims based on race fail for the same reasons as her race discrimination claims do. There is no evidence on the record to connect her race to any retaliatory conduct.

Protected activity under the ADA, PHRA, and the PFBO includes informal, oral complaints to management about acts violating anti-discrimination statutes. See e.g., Donnelly v. Cap. Vision Servs., LP, Civ A. No. 20-4189, 2021 WL 3367271, at *6 (E.D. Pa. Aug. 2, 2021) (citing Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001)). Plaintiff complained to Stokes about Watson's comments regarding A.A. on multiple occasions, and submitted a written complaint about a manager whom she believed was violating her rights. This constitutes protected activity. Additionally, using

qualified FMLA leave satisfies the first element as to retaliation under the FMLA. See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012); Capps v. Mondelez Glob. LLC, 147 F. Supp. 3d 327, 336 (E.D. Pa. 2015), aff'd, 847 F.3d 144 (3d Cir. 2017).

There was a short time between plaintiff's termination and her two protected activities: (1) complaining to Stokes about discriminatory comments; and (2) using her permitted FMLA leave. This provides further support for a claim of retaliation. See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (internal citations and quotation marks omitted). Along with evidence of Stokes's own antagonism toward plaintiff's leave usage to take care of her daughter and her attempts to make plaintiff quit, there is enough evidence for a reasonable juror to find that the reason given for her termination was a pretext. See Fuentes, 32 F.3d at 764; Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 330 (3d Cir. 2016).

VI

For the above reasons, the court will grant the motion of the defendant for summary judgment as to plaintiff's race discrimination and retaliation claims. It will deny the motion as to plaintiff's associational disability claims under the ADA,

the PHRA and the PFBO, and her retaliation claims under the ADA, the PHRA, the PFBO, and FMLA.